Our next case is Berry v. Ford Motor Company, 15-1699. Mr. Sprinkle, you reserved four minutes of your time. I did, Your Honor. Okay, you may proceed. Thank you. May it please the Court, we're here today on a decision granting summary judgment in the East District of Michigan. For a summary judgment motion, the rule is simple and clear. If there is a material question of fact, it must be reversed. Just out of curiosity, it's not an issue that was brought up, but why shouldn't this case be back in state court? How do we have jurisdiction over this case? It should be in state court, and I think it may, hopefully it's headed there. It started out in state court. We brought it in state court. It was moved to federal court because of the allegations of ownership of patent rights. Admittedly, there has to be more than a scintilla of evidence for a material fact, but I think we've met that more. On this jurisdictional question, you're saying that this really shouldn't be before us. It should be in state court, in Michigan state court, but you were the one that brought the inventorship claim, right? That's correct. Right. So you'd have to be arguing the only way that the existence of an inventorship claim wouldn't be sufficient to sustain jurisdiction here over not only that claim, but also the supplemental jurisdiction over the state law claims would be if the inventorship claim were frivolous, and you're not arguing that, I take it. No, we're not arguing that it's frivolous. Well, then how do we not have jurisdiction? We do have jurisdiction. Well, I thought you said it shouldn't be here. I said we started off in state court. Well, I thought in your first response to the judge was that this case shouldn't be in the federal courts. It should be. Okay. You have jurisdiction. Thank you. My apologies. In any event, the underlying facts in this case are really undisputed. Back in 2006, Ford was having difficulties getting funding and developing a sync system. They couldn't get funding, so they contacted Mr. Berry for help. Mr. Berry came in. He's a telephone communication expert, and Mr. Berry, in the fall of 2006, redesigned the sync system. Is it your argument that Mr. Berry provided Ford with intellectual property as opposed to just like technical information or technical advice? He provided technical information to Ford that enabled them to redesign the entire sync system. But no intellectual property. It may have included some intellectual property, but it included technical information that some of it clearly was not, when you say intellectual property patentable subject matter, in my view. So your claim is during the fall of 2006, Mr. Berry didn't invent anything in terms of contributing to those four patents? Not quite. Mr. Berry gave a lot of technical information in the fall of 2006. Some of that technical information may very well be patentable subject matter, but not all of it, clearly. Okay. So when did he invent all of the subject matter that relates to the four patents in question that Mr. Berry is seeking to correct the inventorship? I really have nothing to add to the question of the inventorship. My argument today really is directed to the unjust enrichment. Okay. May I continue? Okay. Anyways, Mr. Berry redesigned the system, eliminated the data modem, used the smartphone of the driver instead. That was a cost-saving, of course. He also told Ford the technical information that they could use the voice channel to transmit data. Now, he didn't invent that. In fact, that was invented by a company called Airpiquity that was currently commercializing it. Ford didn't know that, but that technical information was known by Berry, and Berry conveyed that technical information to Ford, which they adopted. Back in 2006, most people who had smartphones did not have a data program. Just to be clear, you're abandoning your inventorship claim? No, I just have nothing to add to it. I don't have enough time to argue both. So I would like to concentrate on the unjust enrichment. Do you know, is there anything in the record that shows that Mr. Berry, at the time in 2006, communicated to Ford Mr. Berry's expectation that he was going to be compensated for the activities that he was doing without any formal contract during the time of 2006? No, no you're not. Okay. I'm sorry, did Ford, is there anything in the record where Ford was somehow intimating, suggesting, or expressly stating that all of the technical information that was flowing to Ford from Mr. Berry during 2006, Ford was planning on paying him for all of that work and technical information during the fall of 2006? There's some testimony, but it's not in the record here. Okay. There were assurances that were made, yes, by Mr. Van Dagen. It's also in dispute that there was no contract in the fall of 2006. There is a dispute about the effect of Mr. Zhu's contract. Ford believed that Mr. Zhu had, in December of 2006, Ford believed that Mr. Zhu had access to Mr. Berry, but there's no document to support that, and Mr. Berry disputes that Mr. Zhu had any. Why would Mr. Zhu be paying Mr. Berry if that was the case? He helped him. Mr. Berry helped, no question about it. Mr. Zhu was unsuccessful in designing it, but Mr. Berry entered into a contract to develop the SDN in May of 2007, and he was paid to do that, certainly. Under the unjust enrichment claim, the D&B case is the controlling law in Michigan. It's from the Court of Appeals. It hasn't been reversed. It's a recent law. And under the D&B case, Ford had problems with their headliners. They were wrinkled. And so D&B came in and said, well, put these blocks in the mold, and voila, it worked. They later brought suit. They collected damages. Well, actually collected money for that unjust enrichment. In this case — What is your — I'm sorry. Go ahead. What is your answer to the suggestion that this was an arrangement in which, at least implicit in the arrangement, was the contemplation that with some — after some initial period of working cooperatively without a contract and without compensation, that Mr. Berry expected that he would have a good chance of getting a lucrative contract from Ford, and indeed he ultimately did. Why does that not undermine the argument for unjust enrichment? Well, there's nothing to support that, for one thing. Well, he did end up with a lucrative contract from Ford. Mr. Berry gave up a more lucrative job offer in order to do that contract. In that case, he made a bad deal, but he nonetheless got — it wasn't as if Ford said, okay, now that you've given us all that you have to offer, you're out of here. I mean, he ended up with what most people would regard as a pretty attractive contract. Mr. Berry was well paid to develop the SDN as a part of SYNC. That has nothing to do with the 911 assist. The SDN has nothing to do with the data communication. That's the vehicle health report. And the SDN really has nothing to do with the conversion over to the smartphone. Those are all things that were separate. Those are things that — technical information that Mr. Berry had. But he got his foot in the door with Ford. He got his foot in the door with Ford and ultimately ended up being paid pretty well for work that he did for Ford, right? For the SDN, but it's not like he got his foot in the door. Ford called him. Well, initially, but his — In other words, there are lots of instances in which people in services or selling products will offer, in effect, free samples at the outset. They'll say, take this product. Use it for a while. If you don't like it, send it back. If you like it, pay us or buy some more, whatever, or services. Somebody comes in and says, I'll work you for a year for free. At the end of the year, you decide whether you want to hire me, and I bet you're going to want to hire me. That's not unjust enrichment, is it? If the company ultimately decides, thanks for your year, you're out of here. That wouldn't be unjust enrichment, right? I would agree that would not be unjust enrichment, but it didn't happen here. Okay. Why is that different from what happened here? Because he never got into the place where, hire me, I'll do all this work for free, and then you'll hire me. What companies like Ford do is they make contracts — But he was working for free for a period of time. He was working, yes, for free for a long period of time. And his hope was probably, or we can see that as his hope was, I'm going to work for free. You're going to see that I'm smart. I can contribute. I can add part to the knowledge, and maybe you'll hire me in the future. But there's nothing in the record that would even suggest that that happened. That's the problem with that. But I guess also what might be a problem going the other way is that there's nothing in the record that suggests that Mr. Berry was expecting any kind of compensation for the time that he was working for free. Under Michigan law, Mr. Berry did not have to say that he expected compensation. Under Michigan law, under the DMV case, which controls unjust enrichment, the only question is whether or not technical information was given and whether it created a benefit. And in that case, that happened. The floor relies upon the Preston case. For unjust enrichment claims, you're saying all that matters is whether a benefit was conferred? Well, the technical information was granted. Well, it's actually several of us. Well, the technical information was conveyed and used by the defendant. And whether that unjustly enriched the defendant. You're into your rebuttal time. Do you want to reserve your time? I've got to say a couple more things. Okay. I didn't have time. Your choice. That's all that's required. There's one other element, which is the request. There has to be a request from the defendant. And in this case, it clearly was a request for calling Mr. Berry and had him come in. That's the law in Michigan for unjust enrichment. The floor, the defendant floor relies upon the Preston case, which has nothing to do with unjust enrichment. The Preston case has only to do with ownership of intellectual property. Unjust enrichment deals with compensation for technical information. That's what we're talking about, compensation. Not ownership of that technical information. Some of the technical information that Mr. Berry provided, clearly he didn't know, such as the data communication system that was created by Arbiquity. He didn't develop that, but he knew about it, and that was technical information. He also had, he was a telephone communication expert. He had information how one can legally make a 9-11 call automatically. There are laws against that. You can't do it. They don't want home security systems calling 9-11 every time it's accidentally tripped. But he said, yes, you can make an automated call, or what looks like an automated call, and here's how you can do it. He told them how to do it using the DTMF tones on the dial tone to communicate with the 9-11 operator. Compliance with federal laws concerning automated 9-11 calls, I doubt that that's patentable subject matter, how you comply with the law. But it is technical information, and under DMV, he's entitled to compensation. Well, Mr. Berry is a sophisticated person. Can I reserve two minutes? I won't ask, so you go ahead and finish. No, no, I mean, I won't, I'll withhold my question, so you go ahead and proceed as you see fit. I reserve two minutes. Okay, that's fine. I'll say you're two minutes. Go ahead, Judge. Well, okay, since we're, thank you. Thanks to the Professor, Judge, I will. What, give us an idea as to what Mr. Berry's state of mind may have been. He's a sophisticated man. This is not somebody that just fell off the turnip truck. He's very sophisticated. So he goes into Ford, and Ford says, if you want to come in and help us, we'll give you an office, we'll give you an e-mail, so forth. And he agrees, and one thing that isn't happening, at least for a couple of months, is he's not getting a check. What does he think is going on? Do you know why he did all these things? I am curious. I will tell you why. He had a job that paid him about $500,000 a year. He quit in June. His old employer did not want him to go to work for the competitor, who he had a new job with, until the beginning of the following year. His former, the job that he quit, agreed to pay him through December. The new job started in January. He's free. He's got a lot of time on his hands. That doesn't help you. Yeah, it does. He's being compensated during, what, from September to December? He's being compensated by a third party, and he's bored. He goes into, he's got friends at Ford. He goes in, he helps them, he's better than sitting around the house. He had every intention of taking the new job in January, but the thing was just taking off. He had so much effort to stay. He had no expectation that he was going to be compensated for the work that he did between September and November. That's what you're saying. From Ford. He certainly had no agreement. He certainly had an expectation. You're saying he just wandered in and helped out for a while, and that was sort of recreational. No, I won't say he had no expectation. He certainly had no agreement that he would be compensated. All right. Thank you. May it please the Court, Morgan Goodspeed on behalf of Ford Motor Company. Many of Your Honor's questions go to the point in this case, which is that as Mr. Berry admits, in the fall of 2006, he was bored. He had friends at Ford. He went into Ford and pitched some ideas, and those ideas landed him a series of contracts that earned him well over a million dollars. That's not a case where there's any unjust enrichment because the other component of Michigan law that Mr. Berry leaves out is the unjust part. It's not just that Ford needs to earn a benefit here. It's that it has to be unjust for some reason for Ford to be the one to keep that benefit. But that's not the only reason why Michigan law precludes the claim here. The other reason, and really the critical one here that the district court focused on, is that under Michigan law, an express contract will preclude a claim for unjust enrichment. And here it's undisputed that at least as of May 2007, there were contracts between Ford and Mr. Berry that said any intellectual property, any inventions or discoveries or improvements that were reduced to practice after the time those contracts began. Well, that's fine. That may cover the inventorship problem, but it doesn't seem to me it covers the initial period in which he was going in to work, in effect, for free. So there was no contract at that point. So it seems to me your contract argument really doesn't get you where you need to go with respect to the period from September to November. What do you say about that? Well, Your Honor, it does get us there for a couple of reasons. And the first is to the extent that time period was simply when Mr. Berry was pitching ideas that he would later reduce to practice while at Ford, it would be a complete end run around the contract, which says either conception or reduction to practice is enough for Ford to own the intellectual property. If Mr. Berry can then go back and say, well, fine, Ford, you own the intellectual property, but I want unjust enrichment for the conception component. Here's why it doesn't seem to me that the contract helps you very much. Because had Ford decided in November, well, thank you very much, Mr. Berry, but we don't really need you now, and there'd been no contract, would you concede that there would be unjust enrichment for the period between September and November in which he wasn't being paid and there was no contract? Your Honor, we wouldn't concede that there'd be unjust enrichment for the reasons we've discussed before, which is that he was there pitching ideas without an expectation to be paid. But that's still in your argument, right? I mean, the contract doesn't have anything to do with that. No, Your Honor, the reason why the contracts, again, these are alternative arguments, but the reason why the contracts matter here is precisely because that's what Mr. Berry was seeking compensation for in his complaint. He talks a lot today about technical information, but if you actually take a look at his complaint at page 215 in your appendix, at paragraph 11, he lays out what his unjust enrichment suit is for. And this is his fourth amended complaint, by the way. And he says in that paragraph that he's seeking compensation for novel approaches and improvements that he shared with Ford in these early months, that he'll call those his inventions, and that those inventions are all found in the patents and patent applications here. So this technical information theory is not even one that lines up with his complaint. And that's why the existence of an express contract. Your opponent said that one of the reasons why Mr. Berry was not being compensated in that September to November period was because he was being compensated by somebody else. I don't believe that issue was briefed or anything, but was Ford aware of that? It was not being briefed. I believe if Ford was not aware of it, it has come up in discovery that Mr. Berry was being paid by another company, Teleatlas. It's in the record, though not in your appendix. And it's understandable then, I think, that if Ford was interested in having his services, that the wheels moved a little bit more slowly there in light of the fact that he was compensated by another company. But again, going back briefly to my response to you, Judge Bryson, under the theory that is pleaded in Mr. Berry's complaint, the ownership of these inventions is actually the critical thing, and that ownership is governed by the contracts. Again, that's simply an alternative to the argument that there's no unjust enrichment here under Michigan law, because there's no unjust component. I guess theoretically why couldn't there be an unjust component just for the period where there was no contract in the sense that there was services being rendered, there was labor being done, and there was some value arguably being extracted by Ford, and there was no compensation during that time frame. So why do we have to conclude that there's no genuine issue of material fact, that all those facts line up to a potential unjust enrichment theory, regardless of whether whatever was conceived during that time frame down the road was reduced to practice and led to patents? What's more important is just that critical time frame, just isolating that and looking at that. Why can't there be an unjust enrichment theory on that? Sure. Well, Your Honor, Mr. Berry has never pointed to any case in which what essentially amounted to someone's pitch would then earn him a benefit as it did here. Undisputably, he received over a million dollars. So it's not accurate to say that Ford received a benefit. I guess my concern, slight concern, is that there isn't something in the record, there isn't any statement in the record that demonstrates that that is what was going on in the fall of 2006, that this was an attempted pitch to induce Ford to offer a contract down the road. Now the facts bear out that that's ultimately what happened, but in terms of the party's intentions in the fall, it's less clear. We have to make an inference based on how everything transpired over the next two years, that in fact what could have been happening in the fall was an attempt by Mr. Berry to get Ford to hire him on with lucrative contracts. Well, what we do have in the record is Mr. Berry's statements, 269 and 271 in the appendix, that he never actually sought an agreement to compensation. So we know that, and we know that even if there's some concern under this aspect of Michigan law, we know that based on the theory in Mr. Berry's complaint, all of the intellectual property here is owned by Ford, and that there's no theory of unjust enrichment where Ford could be unjustly enriched by using the inventions that it owns. And again, the other reason why this doesn't work is for one thing that you alluded to here, and that's that Mr. Berry hasn't come into court and said, you know, you should pay me my salary for a couple more months for services rendered. What he's argued instead is that he should be compensated based on Ford's use of the sync system for information that he shared by his own admission without any secrecy or confidentiality. And if that's the argument that he's making, then that's barred as well under this court's decision in ultra-precision, which would say that a claim like that is preempted under federal patent law. A claim that all the plaintiff offered was technical information outside the patent system, offered that without any sort of secrecy, and is now seeking damages based on the use of that information. That's squarely what ultra-precision says cannot be brought under a state law claim. Now, I just want to reiterate then that these are all multiple alternatives. He does, in his complaint, you did point to a clause in the complaint in which he itemizes the invention-related damages that he asserts. But his complaint also has a general request for damages sufficient to alleviate any unjust enrichment. So it would be broad enough, I would think, to include something along the line of Judge Chen's question about whether he would be entitled or should be entitled as a matter of unjust enrichment to some kind of quantum arrow at payment for the period that he worked as an uncompensated employee, in effect, for Ford. What is there about Michigan law that says he's not entitled to that? Well, Your Honor, again, I don't think that is the theory that's found anywhere in his complaint. It's very clear that the theory he was alleging is that he was the owner of this intellectual property, both Paragraph 11, where he defines his invention, and Paragraph 13, where he says, I conceived of these inventions and reduced them to practice before setting them forth. Well, help me then. Let's assume you're right for a moment and just be hypothetical about this. Let's assume that he did say, implicitly or otherwise, in his complaint that he wanted compensation for the work that he did between September and November. And let's further assume that he would make that claim whether he got the later contract or not. What's your answer under Michigan law as to whether he's entitled to unjust enrichment for that work? Our answer is twofold. First, under Michigan law itself, there is no case that Mr. Berry has cited anywhere that someone who was ultimately paid as a result of an interim pre-contractual period. Okay, now let's take the ultimate payment. Let's suppose that, I'm really trying to get a sense of whether someone who walks in the door, works for a while, and then is shown the door, they don't get an ultimate contract, under Michigan law, whether that person would be entitled to unjust enrichment. Because your opposing counsel is saying, absolutely, they are under Michigan law in the Michigan Court of Appeals case. Sure, he's citing B&M Dye, which is a case in which there was no, again, no subsequent contract paid. But even then, the question has to be whether, in light of the circumstances, there was a reasonable expectation. And here, there's no reasonable expectation of payment when Mr. Berry essentially volunteered his services. Upon request. Upon request that he come give a pitch, just like a law firm might. But he was given an office, right? The record isn't entirely clear on the extent of his relationship with Ford, but yes, I think so. I do want to be clear here, even if this court goes down this route, which at this point we've slowed off multiple of the facts that were in place here, but even if the court does, B&M Dye and the circumstances there could be preempted by this court's decision in ultra-precision. And the claim that Mr. Berry makes here is not for services rendered over the course of a couple months. It's for Ford's use of patented information. And he claims that he shared technical information without secrecy or without a confidentiality agreement. That's probably why they're not addressing the IP aspect of the case. Belal Grill Corporation v. City of Detroit says that a contract will be implied only if there's no express contract covering the same subject matter. And here, the subsequent contract would cover the same subject matter if we're talking about the IP intellectual property matters. But probably not if it's technical information. Sure. Your Honor, maybe I've been unclear here. Let me lay it out this way. Mr. Berry is trying to have it both ways. At the motion-to-dismiss stage, Ford said, you are seeking compensation for technical information, and so you are doing exactly what this court has said in ultra-precision, cannot be done, and your claim is preempted. And Mr. Berry said, no, because actually I'm seeking information related to the patents themselves. I am the owner of the patents. And that allowed him to survive his motion-to-dismiss. So he ran from ultra-precision, and now he runs directly into Preston, which says, okay, if what we're talking about is the intellectual property here, not some sort of technical information, then, in fact, Ford owns that intellectual property, and it can't be faulted for failing to pay you for using the intellectual property that it owns. So Mr. Berry's theory has shifted here. On one end, it's covered by ultra-precision. On the other end, it's covered by Preston. And that's even putting aside any concerns the court may have about Michigan law here. And just with my remaining time, I want to briefly address jurisdiction, because Ford does not, in fact, believe Mr. Berry has standing to bring his inventorship claim. But jurisdiction in this case lied not because of the inventorship claim, but because the state law claims as originally pleaded necessarily raised a substantial question of federal patent law. And that's because, as originally pleaded, under the theory that Mr. Berry originally had, he had to demonstrate both for his unjust enrichment claim and for a fraudulent inducement claim that is no longer at issue. He had to demonstrate that he was, in fact, the sole inventor of the patents. And so the state law claims themselves raised a question of inventorship. That's just like this court has said in cases like HIF-BIO, in cases like SHUM, if the theory in the complaint necessarily requires a determination of inventorship, then that's enough for jurisdiction. Do you think there's an alternative theory for affirming the district court, that there's just a lack of evidentiary proof that an actual benefit was conferred during the fall of 2006? Your Honor, I think that is a reasonable theory for this court to affirm on. Again, it in some ways depends on which of Mr. Berry's theories the court wishes to credit. But to the extent it is crediting his technical information theory, then that would be available. Okay, thank you very much. Mr. Sprinkle, I'm going to extend your time back to three minutes. Thank you, Your Honor. I'm going to just address some of the things that counsel addressed. First, the preemption argument has been raised, and this is in violation of patent law, and so forth. It hasn't been raised before, but it fails. As counsel pointed out in their briefing, unjust enrichment has another element. That other element is there must be a request. One cannot burst into Fort Headquarters and say, I've got a great idea, and have it be unjust enrichment. In this case, they requested that Mr. Berry came in. They requested that he come in, and they told him the problem. He provided some solutions. That's a little different than pitching your own idea. Another requirement for unjust enrichment is that the benefit, the retention of the benefit, had to have been unjust. The unjust is that they made a lot of money off of the technical information that he provided. And that benefit, the money that they made from it, is sufficient to be unjust. But on the preemption argument, the request, that's the additional element. The confusion for me about the argument that they made a lot of money off of the benefit is that whatever he provided in the fall of 2006, it wasn't siloed off from everything else that he did under the contracts for the following few years. I mean, it was all connected together. These were projects that he started thinking about and tinkering with in the fall, and then they continued on under the contracts that now he was getting paid. I don't think that's an accurate statement, to be honest. What he did is he designed the architecture, and he was called the chief architect by independent witnesses, but he designed the architecture for the overall sink system. And then it had to be built. He built one component of that, which is CSDM. There's one other thing I do want to address, and that's the old imprecision. Where's the evidence in the record of what he did beyond what he said, what he testified to what he did? Well, he certainly testified to what he did. Yes, I understand that. And we certainly have testimony from Mark Scalf and Mr. Nixon, who were independent. But none of those refer back to what he did in 2006. Yes. They said that he designed, he was the architect for the sink system in 2006. Oh, where does it say that, in 2006, that he did this particular work in 2006? Because the architecture had to be designed before it got funded by the PPC in November 2006. Can I say one thing about the ultra-precision case before I move on? Yes. Thank you. The ultra-precision case really doesn't have much effect here either. It's really, they had a pleading problem. They pled that they wanted a royalty, just like a patent royalty. They said, you can't do that. Federal law preempts that. And the judge said, why don't you go back and amend it to just say unjust enrichment? The benefit. And they declined to amend the complaint to plead unjust enrichment, so they lost. But that was really, the ultra-precision case was really just a pleading problem. Thank you very much. Thank you.